# EXHIBIT 1

## TO

## "Registration of Judgment of the United States District Court for the Eastern District of Virginia for Enforcement"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



OLIVIA RUX, et al.,

     Plaintiffs,

v.

THE REPUBLIC OF SUDAN,

     Defendant.

**JUDGMENT IN A CIVIL CASE**

CASE NUMBER: 2:04cv428

[ ] **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[ X ] **Decision by Court.** This action came for determination before the Court. The issues have been considered and a decision has been rendered.

     **IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of Plaintiffs and against Defendant Republic of Sudan in the total amount of $7,956,344; Defendant shall pay post-judgment interest at the applicable post-judgment federal rate from today's date until paid in full.

Date: July 25, 2007         FERNANDO GALINDO, CLERK

                By: _Valerie A. Ward_
                     Deputy Clerk

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY _Valerie A. Ward_
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

FILED

JUL 2 5 2007

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

OLIVIA RUX, et al.,

     **Plaintiffs,**

     v.

THE REPUBLIC OF SUDAN,

     **Defendant.**

Civil Action No. 2:04cv428

## OPINION & ORDER

This action arises from the October 12, 2000, terrorist bombing of the American warship U.S.S. Cole during a temporary refueling stop in the Port of Aden, Yemen, in which seventeen American sailors were killed. Plaintiffs Olivia Rux, *et al.* ("Plaintiffs"), more than fifty surviving family members of the deceased sailors, allege that Defendant Republic of Sudan ("Sudan") is liable for damages from the attack because it provided material support and assistance to Al Qaeda, the terrorist organization whose operatives planned and carried out the attack. Plaintiffs have brought this action pursuant to the Foreign Sovereign Immunities Act ("FSIA"), *inter alia*, 28 U.S.C. § 1605(a)(7), which establishes subject matter jurisdiction for personal injury or death resulting from acts of state-sponsored terrorism. Upon evidence adduced at a non-jury trial before this Court on March 13-14, 2007, the Court concludes that judgment shall be entered for Plaintiffs.

## I.    BACKGROUND

Plaintiffs initiated this action against Sudan on July 16, 2004. Sudan failed to appear to defend the suit, and a default was entered on February 16, 2005. The Court vacated the entry of default after Sudan made a general appearance and Sudan filed a motion to dismiss Plaintiffs'

Complaint. This Court denied the motion on August 26, 2005.[1] On September 1, 2006, the

United States Court of Appeals for the Fourth Circuit affirmed this Court's denial of Sudan's

motion to dismiss for lack of subject matter jurisdiction. Rux v. Republic of Sudan, 461 F.3d

461, 465-66 (4th Cir. 2006), cert. denied, No. 06-772, 127 S.Ct. 1325 (2007). Pursuant to this

Court's August 26, 2005, order, Sudan was required to answer the Complaint not more than

three days from the date of the issuance of the mandate from the Court of Appeals. After failing

to have Plaintiffs' Complaint dismissed in its entirety, Sudan notified the Court by letter on

October 25, 2006, that it would "not defend or otherwise participate in this proceeding on the

merits." Def.'s Letter of Oct. 25, 2006. The deadline to file an Answer expired on October 27,

2006, without a response from Sudan. On November 2, 2006, this Court ordered Sudan to file an

Answer or other responsive pleading within twenty-one days. Sudan again did not respond. In

light of Sudan's refusal to participate, the clerk entered default against Sudan on February 2,

2007. However, pursuant to 28 U.S.C. § 1608(e), Plaintiffs were required to submit evidence

"satisfactory to the court" before a default judgment against Sudan could be entered. 28 U.S.C.

§ 1608(e).

Prior to trial, Plaintiffs amended their Complaint to add claims under the Death on the

High Seas Act ("DOHSA"), 46 U.S.C. app. §§ 761-767, and assert claims for intentional

infliction of emotional distress and maritime wrongful death. Sudan filed a motion to dismiss

the intentional infliction and maritime wrongful death claims for failure to state a claim upon

which relief can be granted on grounds that DOHSA provides an exclusive remedy. The Court

---

[1] The Court denied Sudan's motion on all grounds except failure to state a claim upon
which relief can be granted, which it took under advisement until Sudan was to file an Answer.

2

denied Sudan's motion at that time and reserved ruling on the choice of law and exclusivity of

remedy questions. The case was tried to this Court, sitting without a jury, on March 13-14,

2007. Counsel for Sudan attended the trial but did not participate other than to make a brief

argument at the end of trial regarding damages and to renew its motion to dismiss. (Tr. 201:25-

202:3). The Court concluded at the end of trial that there existed sufficient evidence to enter

default judgment against Sudan pursuant to 28 U.S.C. § 1608(e). This Opinion and Order details

the Court's factual findings and conclusions of law. Fed. R. Civ. P. 52(a).

## II.    FINDINGS OF FACT

### A.    Legal Standard for FSIA Default Judgment

The FSIA requires that a default judgment against a foreign state be entered only after a

plaintiff "establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C.

§ 1608(e). This provision requires the court to satisfy itself that there exists an adequate legal

and factual basis for plaintiffs' claims. Owens v. Republic of Sudan, 374 F. Supp. 2d 1, 8-9

(D.D.C. 2005). In default judgment proceedings, plaintiffs may present evidence in the form of

affidavits. Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 82 (D.D.C. 2006);

Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 268 (D.D.C. 2003). Upon

evaluation, the court "may accept plaintiffs' uncontroverted evidence as true." Id.

In accordance with this relaxed evidentiary standard, the Court finds the following facts

based on Plaintiffs' uncontroverted evidence, which consists of 183 exhibits including various

depositions and live witness testimony. The exhibits relevant to the Court's finding of liability

include transcripts of depositions taken by Plaintiffs of terrorism experts. R. James Woolsey was

an expert who appeared voluntarily without compensation. Mr. Woolsey was the Director of

3

U.S. Central Intelligence from 1993 to 1995 and is now a Vice President at Booz Allen Hamilton in McLean, Virginia. Douglas Farah, the President of IBI Consultants, LLC, and a former reporter for the *Washington Post* in West Africa who has studied and written extensively on terror finance and radical Islamic groups, was another expert. Also deposed were Steven Emerson, Executive Director of The Investigative Project on Terrorism and an expert on Islamic extremist networks, and Lorenzo Vidino, a Research Program Manager at the Jebsen Center for Counter-Terrorism Studies at The Fletcher School of Tufts University. The evidence also includes unclassified U.S. Department of State reports; the 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States ("the 9/11 Commission Report"); a five-volume U.S. Department of the Navy report documenting the Navy's investigation into the Cole attack (the "Navy Report"); and a transcript of federal criminal proceedings against Osama Bin Laden in 2001.

**B.      The Attack on the U.S.S. Cole in the Port of Aden, Yemen[2]**

At approximately 8:30 a.m. on October 12, 2000, the U.S.S. Cole ("Cole") entered the Port of Aden, Yemen, to temporarily stop for refueling. The Republic of Yemen is a country of 203,850 square miles located on the southern coast of the Arabian Peninsula. Aden is a city of approximately 440,000 located on Yemen's south coast. The Port of Aden is a natural harbor with a deep draft in most areas and natural land protection on all sides. In February 1999, the Navy began using Aden instead of Djibouti as the primary refueling stop for American ships

---

[2]This section is largely based on the Navy report, which describes the attack and its aftermath in extraordinary detail. See Ex.158, Investigation to Inquire Into the Actions of USS Cole (DDG 67) In Preparing For And Undertaking a Brief Stop For Fuel at Bandar at Tawahi (Aden Harbor) Aden, Yemen, On Or About 12 October 2000.

4

during their 3,000-mile journey to the Arabian Gulf from the Mediterranean Sea. Under a contract entered into between the United States and Yemen, U.S. Navy vessels could obtain fuel at one of two fueling "dolphins" located near the mouth of the harbor without going to the pier.

The Cole, an Arleigh Burke Class Destroyer, was the twenty-fifth Navy ship to stop in Aden Harbor for refueling over the previous nineteen months. As of October 2000, the ship had a crew of twenty-six officers and 270 enlisted personnel. The Cole departed from its home port of Norfolk, Virginia, on August 8, 2000, before patrolling the Mediterranean Sea. On October 9, 2000, the ship transited the Suez Canal and headed for Yemen. At the time that the ship entered the Port of Aden on October 12, 2000, the U.S. Department of Defense terrorist threat level in Aden was "Threat Condition (THREATCON) BRAVO," which indicated an "increased and more predictable threat of terrorist activity."

At approximately 8:49 a.m., the Cole moored starboard side to Refueling Dolphin Seven, near the mouth of the harbor. The ship began refueling at approximately 10:31 a.m. At approximately 11:10 a.m., one of the sailors standing watch over the refueling noticed a small boat heading "fast and hard" toward the Cole from the direction of the city. The boat, painted white with fire red trim, was about thirty-five feet long and six to seven feet wide and had a shallow V-hull. It looked "brand new." (Ex. 158 at 70.) The boat was similar in size and shape to many other small vessels in the harbor, including the service craft that had been alongside the Cole. The boat was manned by two males, both of whom appeared to be in their early thirties. The two men slowed the boat as they approached the Cole, maneuvered it parallel to the ship and came down the port side headed aft. As they did so, the two men in the boat were smiling, and waved to the crew. Some crew members returned the greeting. Seconds later, the boat

5

exploded.

The explosion occurred between approximately 11:15 and 11:18 a.m., just as some of the crew was sitting down for lunch. The blast ripped a thirty-two- by thirty-six-foot hole in the port side. One sailor sleeping in his bed "was awakened by a loud explosion and thrown upward about three inches. I didn't know what happened, but I knew that anything that could throw me out of my rack had to be bad." (<u>Id.</u> Encl. 66 at 1.) Smoke, dust, and fuel vapors filled the air. The main engine room, auxiliary machine room, and the dry provisions storeroom were flooded. Several chambers, including the Crew and Chief Petty Officer's Galley, were structurally destroyed. The blast and its after-effects killed seventeen Navy sailors, all of them American citizens. Forty-two others were injured, some of them sustaining serious burns to their faces, hands and arms, as well as lacerations and fractures.

### C.     The Decedents and Plaintiffs

Plaintiffs are fifty-nine surviving family members of the seventeen sailors who died. Seven of the plaintiffs are the surviving spouses or permanent companions of a deceased sailor, nineteen are siblings of a decedent, twenty-three are parents, and ten of the plaintiffs, on whose behalf suit is brought by the next friend of each, are minor children. The seventeen decedents are the following:

1. Kenneth Eugene Clodfelter, age twenty-one. Mr. Clodfelter, a hull technician, is survived by his wife, Jennifer Clodfelter; his minor son, Noah Clodfelter, now eight; his parents, John and Gloria Clodfelter; and his younger brother, Joseph Clodfelter, all of them plaintiffs.

2. Richard Costelow, age thirty-five. Mr. Costelow, a Chief Petty Officer specializing in electronics and communications, left behind his wife, Plaintiff Sharla Costelow; his parents,

6

Plaintiffs George and Dorothy Costelow; and his two minor sons, Plaintiffs Ethan Costelow and Brady Costelow.

3.   Lakeina Monique Francis, age nineteen.  Ms. Francis, of North Carolina, was a mess specialist aboard the Cole.  Her survivors are her parents, Plaintiffs Ronald Wallace Francis and Sandra Annette Francis; and her younger brothers Plaintiffs David Francis, and James Winston Francis, III.[3]

4.   Timothy Lee Gauna, age twenty-one.  Mr. Gauna handled electronic communications aboard the Cole.  He is survived by his mother, Plaintiff Sarah Gauna-Esquivel.

5.   Cherone Louis Gunn, age twenty-two.  Mr. Gunn, a signalman apprentice from Virginia, left behind his parents, Plaintiffs Louge Gunn and Mona Taylor Gunn; and his three brothers, Plaintiffs Jason Gunn, Jamal Gunn, and Anton J. Gunn.

6.   James Rodrick McDaniels, age nineteen.  Mr. McDaniels, a Virginia native who handled communications aboard the Cole, is survived by his fiancée, Plaintiff Novella Wiggins; his son, Plaintiff James Rodrick McDaniels, Jr.; his mother, Plaintiff Diane McDaniels; his sister, Plaintiff Frederica McDaniels-Bess; and two brothers not party to this suit.

7.   Marc Ian Nieto, age twenty-four.  Mr. Nieto, a mechanic born in Illinois, is survived by his father, Plaintiff Jesse Leroy Nieto.

8.   Ronald Scott Owens, age twenty-four.  Mr. Owens, an Electronic Warfare Technician, was survived by his wife, Plaintiff Jamie Owens, and daughter, Plaintiff Isabella Marie Owens,

---

[3]Presumably due to oversight, Plaintiffs David Francis and James Winston Francis, III, are not named in the body of the Fourth Amended Complaint.  However, both of them were added as plaintiffs on November 12, 2004, and are named in the caption of the Fourth Amended Complaint.  The Court will deem the Fourth Amended Complaint to include both of them.

7

now eleven.

9. Lakiba Nicole Palmer, age twenty-two. Ms. Palmer, a cook aboard the Cole, was survived by her daughter, Plaintiff Capri Kumar, now seven; her brother, Plaintiff Kenyon Embry; and her mother, Plaintiff Teresa Smith.

10. Joshua Langdon Parlett, age nineteen, was a fireman/engineman aboard the Cole. His survivors are his parents, Plaintiffs Leroy Parlett and Etta Parlett, and his siblings, Plaintiffs Kera Miller, Hannah Parlett, and Matthew Parlett.

11. Patrick Howard Roy, age nineteen. Mr. Roy, a fireman aboard the Cole, was survived by his mother, Plaintiff Kate Brown, and his brothers, Plaintiffs Sean Walsh and Kevin Michael Roy.

12. Kevin Shawn Rux, age thirty. Mr. Rux, who had served twelve years in the military and specialized in electronic warfare, was survived by his wife, Plaintiff Olivia Rux.

13. Ronchester Mananga Santiago, age twenty-two. Mr. Santiago, a Third Class Petty Officer from San Diego, California, was survived by his parents, Plaintiffs Rogelio Santiago and Simeona Santiago.

14. Timothy Lamont Saunders, age thirty-two. Mr. Saunders, a Second Class Petty Officer and operations specialist, was survived by his wife, Plaintiff Jacqueline Saunders, and his minor daughters, Plaintiffs Isley Gayle Saunders, now seventeen, and Jocelyn Tiera Saunders, now thirteen.

15. Gary Graham Swenchonis, age twenty-six. Mr. Swenchonis, an engineer, left behind his parents, Plaintiffs Gary G. Swenchonis and Deborah Swenchonis, and his sister, Plaintiff Shalala Swenchonis-Wood.

8

16. Andrew Triplett, age thirty-one. Mr. Triplett, an engineman who had spent thirteen years in the Navy, was survived by his wife, Plaintiff Lorrie D. Triplett; his two daughters, Plaintiffs Andrea Triplett, now fourteen, and Savannah R. Triplett, now ten; his parents, Plaintiffs Reed Triplett and Savannah Triplett; and his siblings, Plaintiffs Kevin Triplett, Wayne Triplett, Freddie Triplett, and Theodis Triplett..

17. Craig Brian Wibberly, age nineteen. Mr. Wibberly was survived by his parents, Thomas Wibberly and Patricia Wibberly, and his sister, Toni Wibberly, all of them plaintiffs.

Many of the Plaintiffs learned of the attack the day it occurred from the television news, or from friends or relatives. Some families were visited by military personnel at their homes and told that their loved ones were "presumed missing." They waited anxiously, many of them for days, before being told that in fact their loved one had died. Each of the Plaintiffs suffered upon learning that their husband, son, daughter, or sibling had been murdered in a terrorist attack. As Sarah Gauna-Esquivel, Timothy Lee Gauna's mother, testified, "It was like somebody just yanked all your insides out, and part of me died when I lost my son." (Ex. 116 at 17:4-5.) Diane McDaniels testified, "[I] had a nervous breakdown. I couldn't eat, couldn't leave the house, couldn't do nothing, couldn't walk." (Ex. 122 at 14:21-23.) Plaintiff Louge Gunn, a trauma and grief counselor for the U.S. Department of Veterans Affairs, testified that he "went into a panic" when he learned that his son Cherone was killed. "I fell to the floor on my knees. And I mean it was the most devastating thing that ever happened in my life. And I don't know, at the time I just felt like somebody had put their hand inside my body and grabbed me from the inside and pulled my skin inside. That's how much pain I was in at the time." (Tr. at 29:23-30:5.) It took several days for many of the decedents' bodies to be recovered in Yemen and sent back to the

9

families in the United States. Some families held multiple funerals as additional body parts were recovered, identified, and sent home for burial.

Years after the attack, the parents, wives, husbands, children, and siblings of the brave servicemen and women murdered on October 12, 2000, continue to suffer an unimaginable loss. Many of the Plaintiffs experience depression, among other emotional and physical ailments that, they testified, began in the aftermath of the attack. To assist these relatives of the decedents, the Navy and the Department of Veterans Affairs have distributed lump-sum survivor benefits and other compensation to many Plaintiffs.[4]

### D.  Sudan and Al Qaeda

Sudan is a country of 41.2 million inhabitants at the east end of the Sahara desert in northern Africa.[5] Sudan is bounded on the northeast by the Red Sea. Directly across the Red Sea from Sudan is the Republic of Yemen, and the span between the two countries can be easily crossed by boat. (Ex. 156 at 7-15.) Sudan's population is a majority Sunni Muslim, most of whom are in the north. The country has for years been ravaged by war and humanitarian crises, including an ongoing conflict that began in the mid-1980s between the Muslim government in the north and rebels in the rural south, which is populated largely by tribal and Christian groups. A rebellion in the Darfur region of western Sudan that began in 2003 has led to the deaths of at

---

[4]By statute as of 2000, eligible survivors of members of the armed forces who die in active duty were entitled to a death gratuity payment of $6,000. See 10 U.S.C. §§ 1475, 1477-78. The statutory death gratuity benefit was increased to $100,000 in 2006. See National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat. 3136 (2006).

[5]See generally U.S. Department of State, Bureau of African Affairs, Background Note: Sudan, March 2007, http://www.state.gov/r/pa/ei/bgn/5424.htm (last visited July 23, 2007); The World Almanac and Book of Facts 830-31 (2007).

10

least 200,000 people and forced more than two million to flee to refugee camps.

In 1989, General Omar Bashir assumed the presidency of Sudan in a military junta that overthrew the elected government and converted Sudan into an Islamic Arab state. Bashir remains Sudan's President today. The coup was orchestrated by Hassan Abdallah Turabi, head of the Sudanese political party the National Islamic Front ("NIF") and leader of the Muslim Brotherhood. Turabi was the regime's de facto leader from 1989 until late 1999, when he was ousted and later put in jail. (Exs. 15 & 154 at 18; Tr. 68, 121:4-5.) During the 1990s, Turabi and the NIF transformed Sudan into a centralized, radical Islamic state that openly supported movements and organizations with militant Islamic, anti-American, anti-Western ideologies. (Exs. 153 at 12 & 154 at 18-19.) Since 1993, the United States has continuously designated Sudan as a state sponsor of terrorism. 58 Fed. Reg. 52523-01 (Oct. 8, 1993). In 1996, the United States imposed comprehensive economic, trade, and financial sanctions against Sudan. That same year, the United Nations Security Council approved sanctions against Sudan for its alleged connections to the attempted assassination of Egyptian President Hosni Mubarak.[6]

Al Qaeda is a worldwide terrorist network led by Osama Bin Laden that has declared war against the United States and others who do not share its militant brand of Islam.[7] Al Qaeda was founded by Bin Laden in Afghanistan in approximately 1990 to serve as a base for like-minded Sunni Islamic extremists. (Ex. 22.) During the Afghanistan war from 1979 to 1989, Bin Laden, the son of a wealthy Saudi construction magnate, organized and financed the recruitment and

---

[6]See S.C. Res. 1044, U.N. Doc. S/RES/1044 (Jan. 31, 1996); S.C. Res. 1054, U.N. Doc. S/RES/1054 (April 26, 1996); S.C. Res. 1070, U.N. Doc. S/RES/1070 (Aug. 16, 1996).

[7]Bin Laden and Al Qaeda are spelled various ways. The Court uses "Bin Laden" and "Al Qaeda" herein for consistency.

training of Arab nationals to fight alongside the Afghan mujahadin against the Soviets. (Ex. 17.) As is well known today, Al-Qaeda has organized, executed or inspired acts of terrorism around the world that killed or injured thousands of innocent people, including the September 11, 2001, attacks on the United States. (Exs. 28 & 77 at 70.) Al Qaeda has supported terrorists in Afghanistan, Bosnia, Chechnya, Tajikistan, Somalia, Yemen, and Kosovo, and has trained terrorists from countries including the Philippines, Algeria, and Eritrea. (Ex. 23.)

Following the Soviet withdrawal from Afghanistan in 1989, Bin Laden's group was no longer welcome in Afghanistan. Bin Laden briefly returned to his home country of Saudi Arabia but was expelled in 1990 for his continued support of terrorism. (Id.) At a time when Al Qaeda found itself without a territory from which it could base its terrorist operations, Turabi offered the organization refuge in Sudan. As stated by a 1996 U.S. Department of State report on Bin Laden, Bin Laden "relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hasan al-Turabi." (Ex. 17.) Bin Laden lived in Sudan from 1991 until May 1996, when he was expelled from the country under international pressure. He then relocated to Afghanistan. (Exs. 23 & 77 at 57, 109.)

Turabi and Bin Laden shared a common extremist ideological and religious outlook. (Ex. 77 at 61.) Turabi, who was dean of the University of Khartoum law school in the 1960s, envisioned a pan-Islamic force consisting of both Shiites and Sunnis to counterbalance Western powers militarily, economically, and politically. (Ex. 154 at 25, 27.) As the de facto leader of the Sudanese regime, Turabi sought to impose *sharia*, or Islamic law, as the only source of law in Sudan, a goal shared by Al Qaeda. (Tr. 71:9-24.) Bin Laden agreed to help Turabi in the regime's ongoing war against African Christian separatists in southern Sudan, and also to invest

12

his wealth in the poor country's infrastructure. (Exs. 154 at 21-23 & 77 at 57; Tr. at 73:11-14.)
In exchange, Sudan provided Bin Laden's fledgling terrorist group with a sanctuary within
which it could freely meet, organize, and train militants for operations. (Tr. at 73.)

Bin Laden established several joint business ventures with the Sudanese regime that
began to flourish upon his arrival in the Sudanese capital of Khartoum in 1991. (Ex. 17.) As
stated by the U.S. Department of State, Bin Laden "formed symbiotic business relationships with
wealthy NIF members by undertaking civil infrastructure development projects on the regime's
behalf." (Id.) Bin Laden's businesses in Sudan included (1) Al-Hijrah for Construction and
Development, Ltd., which built the Tahaddi road between Khartoum and Port Sudan on the Red
Sea coast, as well as a modern international airport near Port Sudan; (2) An import-export firm,
Wadi al-Aqiq Company, Ltd., which, in conjunction with Bin Laden's Taba Investment
Company, Ltd., and with the cooperation of prominent NIF members, secured a near monopoly
over Sudan's agricultural exports of gum, corn, sunflower, and sesame products; and (3) Al-
Themar al-Mubarak-ah Agriculture Company, Ltd., which acquired large tracts of land near
Khartoum and in eastern Sudan. (Exs. 17 & 32 at 239, 241.) These businesses provided income
to Al Qaeda, as well as cover for the procurement of explosives, weapons, and technical
equipment, and for the travel of Al Qaeda operatives. (Exs. 24 & 77 at 57-58.) Bin Laden
continued to maintain his substantial business interests and facilities in Sudan even after his
departure to Afghanistan in 1996. (Exs. 23 & 156 at 26-27.)

Sudan allowed its banking institutions to be used by Al Qaeda to launder money. (Ex.
154 at 25.) Bin Laden and wealthy members of the NIF capitalized Al-Shamal Islamic Bank in
Khartoum; Bin Laden personally invested $50 million in the bank. (Exs. 17 & 32 at 332.) In the

13

late 1980s, Sudan adopted an Islamic banking system that forbids interest and lacks the rigorous accounting standards used by Western banking systems. (Tr. 84:5-16; Ex. 154 at 36.) The lack of scrutiny associated with this system was ideal for Al Qaeda because it allowed the group to move large sums of money in support of its operations without detection. (Exs. 154 at 52 & 153 at 15.) As Mr. Farah, who is the author of "Blood From Stones: The Secret Financial Network of Terror," testified, Sudan "provided [Al Qaeda] fundamentally with a banking structure, Islamic structure that's out of the norm of the banking rules that we're acquainted with in the west, and allowed them channels to move money through that would be virtually undiscoverable to the outside world." He added that Sudan "clearly had control over the banking system . . . . [Al Qaeda] couldn't have operated with that degree of freedom and openness if they had not been sanctioned by the central government to do so." (Ex. 153 at 14-15, 26.)

In addition, as reported by the U.S. Department of State in its annual "Patterns of Global Terrorism" reports, the Sudanese military cooperated with Bin Laden and Al Qaeda to finance at least three terrorist training camps in northern Sudan by January 1994. (Ex. 17; Tr. 75:21-24.) Bin Laden's Al-Hijrah for Construction and Development company worked directly with Sudanese military officials to transport and provision the camps, where terrorists of Egyptian, Algerian, Tunisian, and Palestinian origin received training. From as early as 1997 to at least 1999, Sudan served as a "training hub" for Al Qaeda and other terrorist groups that used Sudan as a secure base for assisting compatriots elsewhere. Furthermore, starting as early as 1997 the Sudanese Government provided paramilitary training to terrorist organizations in Sudan.[8]

_____

[8]See Ex. 17 State Department Fact Sheet on Bin Ladin, August 17, 1996; Ex. 22, *Patterns of Global Terrorism: 1997*, U.S. Department of State, April 1998 at 50; Ex. 25, *Patterns of Global Terrorism: 1998*, U.S. Department of State, April 1999; Ex. 28, *Patterns of Global*

14

Starting in the early 1990s, Turabi and the Sudanese regime convened annual conferences in Sudan under the label Popular Arab and Islamic Conference. At these conferences, Bin Laden and other top leaders and operatives from the most violent Islamic terrorist organizations, including Bin Laden's Islamic Army Shura, the Palestinian Liberation Organization, Hamas, and Hezbollah, congregated to exchange information and plan terrorist activities. (Exs. 77 at 61 & 154 at 26.) Turabi saw the conferences as a means of bringing together Sunnis and Shiites in the fight against the common enemy, i.e. the United States and other Western powers. (Ex. 77 at 61.) Mr. Woolsey testified that he was aware of the Popular Arab and Islamic Conference when he was Director of Central Intelligence in the early 1990s. He testified, "[W]e used to call it sort of the terrorist equivalent of the Paris Air Show. It was really quite remarkable. Those of us working in U.S. intelligence [never] thought that Sudan would be this blatant in pulling all of these terrorist organizations together in an annual conference." (Ex. 156 at 20). Although the conference was closed down in approximately 2000, Sudan "continued to be used as a safehaven" by Al Qaeda and other terrorist groups. (Ex. 35.)

As early as 1998, Sudan provided Al Qaeda members with Sudanese diplomatic passports as well as regular Sudanese travel documentation that facilitated the movement of Al Qaeda operatives in and out of Sudan. (Exs. 22; 25; 35; 154 at 31; 53 & 157 at 28.) Diplomatic passports allow the holder to pass through airport security in airports and ports around the world without his bags being checked and without the same level of scrutiny or searches normally given to regular passport holders. (Exs. 154 at 32 & 153 at 17). A diplomatic passport typically lasts between five and ten years (Ex. 154 at 33). Thus, these diplomatic passports issued in 1998

*Terrorism: 1999*, U.S. Department of State, April 2000.

would not have expired prior to 2003. The use of diplomatic passports allowed Al Qaeda agents

to enter and leave Sudan and cross borders in other countries with diplomatic pouches carrying

secret materials to prepare for attacks without arousing suspicion (Exs. 156 at 19; 154 at 33; 157

at 31 & 153 at 14). The Government of Sudan's provision of diplomatic passports to Al Qaeda,

which was necessarily a government function carried out by Government officers or agents, was

critical to Al Qaeda's method of training its operatives in one country and then dispatching them

with their materials to other countries to carry out operations or await instructions. (Tr. 94:23-

95:9). By giving Al Qaeda diplomatic passports, as well as diplomatic pouches that could be

carried without inspection, Sudan enabled Al Qaeda to transport weapons and munitions outside

the country and into other countries undetected by Customs agents. (Exs. 157 at 25; 153 at 18).

As Mr. Woolsey testified, diplomatic passports "would permit them to move materials without

scrutiny in a number of circumstances, and would, I think, be quite helpful in helping them

prepare to—for any terrorist attack." (Ex. 156 at 19:2-6). In addition, Sudan exempted Al

Qaeda and its members from paying any taxes or import duties and permitted it to bring

containers into the country without inspection by Customs (Ex. 154 at 49-50; Ex. 32 at 238-39).

Sudan's support to Al Qaeda continued even after Bin Laden's expulsion from the

country in 1996 and lasted at least until the Cole bombing in October 2000. As reported in the

U.S. Department of State's annual "Patterns of Global Terrorism" reports, each year from 1997

through 2000 Sudan continued to serve as a meeting place, safe haven, and training hub for Al

Qaeda and other terrorist groups including Lebanese Hizballah, Palestinian Islamic Jihad, Abu

Nidal Organization, and Hamas. As of 1999, this support included "paramilitary training,

money, religious indoctrination, travel, documents, safe passage, and refuge" and as of 2000 it

16

"included the provision of travel documentation, safe passage, and refuge. Most of the groups maintained offices and other forms of representation in the capital, using Sudan primarily as a secure base for organizing terrorist operations and assisting compatriots elsewhere." (Exs. 25 & 28.) Mr. Woolsey, who reviewed Plaintiffs' evidence, testified, "[M]y judgment, given the information I've seen here, and given my understanding of the propensities of these types of organizations in that part of the world, I'd say it's quite likely that there was cooperation between Sudanese government principally, probably through its intelligence services, and al-Qaida, as of late 2000." (Ex. 156 at 25.)

The strike against the Cole was part of a decade-long plan conceived and executed by Bin Laden and Al Qaeda to attack U.S. interests in the Middle East, specifically American military forces. (Ex. 72 at 29.) In early 1992, when he was based in Sudan, Bin Laden issued a fatwa that stated that U.S. forces stationed in the Arabian Peninsula, where Yemen is located, should be attacked. (Exs. 24; 54 at 28 & 77.) A fatwa is an Islamic religious decree which purports to direct Muslim followers to commit, or not to commit, certain acts. (Tr. 72:5-13.) Fatwas provided Al Qaeda with religious justification for its terrorist attacks. (Ex. 154 at 29.) By 1992, Bin Laden was well known and a senior figure among Islamic extremists. (Ex. 77 at 59.) At the time that Bin Laden issued his fatwa in 1992, the only American military presence in Yemen was that of Navy vessels refueling in Aden Harbor. (Ex. 154 at 28-30.) In that regard, the fatwa provided religious support for an attack directed at the U.S. Navy. (Id. at 29.) In December 1992, Al Qaeda operatives bombed two hotels in Aden, Yemen, occasionally used by U.S. military personnel, killing two tourists but no Americans. (Exs. 72; 17 & 77 at 59.) According to the 9/11 Commission Report, citing CIA and FBI intelligence reports, the

perpetrators of that 1992 attack "are reported to have belonged to group from southern Yemen headed by a Yemeni member of Bin Laden's Islamic Army Shura; some in the group had trained in an al Qaeda camp in Sudan." (Ex. 77 at 60 & n.44; Tr. 95:25-6:11.) In August 1996, Bin Laden issued a statement outlining Al Qaeda's goals: drive United States forces from the Arabian Peninsula, overthrow the Government of Saudi Arabia, "liberate" Muslim holy sites in "Palestine," and support Islamic revolutionary groups around the world. (Ex. 22.) On February 23, 1998, Bin Laden issued another fatwa that was published by allied groups under the name "World Islamic Front for Jihad Against the Jews and Crusaders." (Ex. 25.) The statement asserted that America had declared war against God and his messenger, and that the murder of any American, military or civilian, was the "individual duty for every Muslim who can do it in any country in which it is possible to do it." (Ex. 77 at 47.) Bin Laden also stated in February 1998, "If someone can kill an American soldier, it is better than wasting time on other matters." (Ex. 23.) By the time he issued his 1998 declaration of war, Bin Laden's organization had blossomed into a substantial, worldwide organization. (Ex. 77 at 55.) Less than a month after the fatwa was published, Al Qaeda operatives began planning the August 7, 1998, bombings of the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, which killed twelve Americans and 212 others, and injured about 5,000 others. (Id. at 69-70.) This was at a time when the Sudanese Government provided the diplomatic passports and military help in transporting materials used by Al Qaeda in its terrorist activities against the United States.

The Cole plot was an Al Qaeda operation supervised directly by Bin Laden. As stated in the 9/11 Commission Report, Bin Laden "chose the target and location of the attack, selected the suicide operatives, and provided the money needed to purchase explosives and equipment." (Id.

18

at 190.) Mr. Emerson and Mr. Vidino both testified that the attack's "mastermind" was Qaed

Salim Sinan al-Harethi, also known as Ali Qaed Sinan Harthi, who was one of Bin Laden's

bodyguards. (Tr. 108:6-7; Exs. 154 at 45-46 & 157 at 33.)[9] Mr. Emerson and Mr. Vidino both

testified that Al-Harethi was trained by Al Qaeda *in Sudan* in the 1990s before being dispatched

to Yemen where, according to Mr. Vidino, he became "the chief of operation[s] of Al Qaeda in

Yemen." (Tr. 108:10-20; Ex. 154 at 46.) Mr. Woolsey, the former CIA Director, testified that

"more likely than not" Sudan was the source of the explosives used in the Cole bombing. (Ex.

156 at 29.) Mr. Emerson testified, "I have no doubt the source [of the explosives used on the

Cole] came from Al Qaeda and was transported to Yemen from Al Qaeda or by the Sudanese

government through most probably the diplomatic pouch." (Ex. 157 at 26.) Mr. Farah testified

that his "best guess" as to the source of the explosives used in the Cole, based on his "studied

opinion and having discussed this case with intelligence officials," is Sudan, "which was the

closest place to Yemen in which they had the safe quarter in which to be able to move this type

of goods across the border." (Ex. 153 at 18-19.) In view of the foregoing, there is sufficient

evidence for purposes of the default judgment standard in 28 U.S.C. § 1610, and the Court

FINDS as a fact, that the explosives used in the Cole attack were sent by Al Qaeda operatives in

Sudan. This finding is corroborated by the testimony of one of Bin Laden's lieutenants in

Sudan, Jamal Al-Fadl, who testified in criminal proceedings against Bin Laden arising out of the

---

[9] See also Ex. 57, Michael Slackman, *Yemeni Religious Leader Tied to* Cole, L.A. Times, Jan. 15, 2003 (Harthi was "the man accused of organizing the suicide attack on the Cole"); Ex. 56, Elaine Monaghan & Daniel McGrory, *Death of Terror Chief Deals Severe Blow to al-Qaeda*, The Times of London, Nov. 5, 2002 (al-Harethi was the "mastermind" behind the Cole, "a key ally of Bin Laden and was on the FBI's most-wanted list"). Al-Harethi and five other Al Qaeda operatives were reportedly killed in a missile strike fired from an unmanned U.S. aircraft in November 2002. (Ex. 57.)

Case 3:07-mc-00127-GCM   Document 1-1   Filed 10/19/07   Page 21 of 26

1998 embassy bombings. (Ex. 32, <u>United States v. Bin Laden</u>, Case No. 198CR1023, Trial Tr. Feb. 6, 2001). Mr. Al-Fadl stated in sworn testimony in a trial before the United States District Court for the Southern District of New York that he worked under Bin Laden in Sudan; that he stored four crates of weapons and explosives at a farm in Sudan owned by Bin Laden; and that he shipped the four crates in an Al Qaeda-owned boat from a facility owned by the Sudanese military in Port Sudan to Yemen, where they were to be used to "fight the Communists." (Ex. 32 at 262, 336-40.)

Based on the expert testimony and documentary evidence, the Court **FINDS** as a fact that Sudan, beginning in the early 1990s and continuing at least until 2000, actively provided Al Qaeda with the support, guidance, Sudanese diplomatic passports and resources that allowed it to transform into a sophisticated, worldwide terrorist network, and that such support was critical to Al Qaeda developing the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the attack that killed the seventeen American sailors on the U.S.S. Cole. Each of the expert witnesses testified that the strike against the Cole would likely not have occurred without Sudan's support and assistance to Al Qaeda in the form of safe haven, military training, diplomatic passports, business partnerships, and lax banking and accounting systems that facilitated money laundering. As Mr. Woolsey, the former CIA Director, testified, the Cole attack "might have been possible, but it would not have been as easy" without Sudan's support. Mr. Woolsey testified, "The proximity of Sudan to—to Yemen, the need for a protected logistics infrastructure, the confused situation in the Government of Yemen at the time . . ., the amount of explosives that needed to be put in the boat that attacked the Cole, all that suggests to me that the logistical support and base of operations that could have

been available in Sudan could have been of substantial assistance to an attack in Yemen, such as the one that occurred." (Ex. 156 at 29.) Mr. Vidino testified that the bombing would have been "close to impossible" without Sudan's assistance because "simply all they needed, starting from the training to the explosives, to all what a terrorist cell needs, even the ideological aspect of it, came from Sudan. It was clearly necessary to have all these things in place to carry out an operation such as the attack on the Cole." (Tr. 112:12-17; Ex. 154 at 47-48.) Mr. Emerson testified that the Cole attack would not have occurred without Sudan. "You would have deprived them of the oxygen needed to operate." (Ex. 157 at 34.) Moreover, Mr. Farah testified, "I don't think the bombing of the Cole could have happened without the active support of the Government of Sudan. . . . I think that from 1992 through the Cole bombing, Sudan provided an incredibly necessary and vital infrastructure for Al-Qaeda to be able to prepare and move the explosives and carry out the attacks on the Cole. And it was not clandestine or hidden presence, but rather fairly overt and knowing presence by senior members of the NIF government in Sudan." (Ex. 97 at 14, 27-30.) The diplomatic passports and pouches utilized by Al Qaeda in furtherance of its terrorist activities were furnished by agents or officials of the Government of Sudan acting within the scope of their office, employment, or agency. Based on this testimony and the evidence supporting it, the Court **FINDS** as a fact by substantial evidence that Sudan's material support to Al Qaeda led to the murders of the seventeen American servicemen and women on October 12, 2000, in the territorial waters of Yemen.

## III.    CONCLUSIONS OF LAW

### A.    Jurisdiction

The FSIA of 1976, 28 U.S.C. § 1602 et seq., provides the "sole basis for obtaining

jurisdiction over a foreign state in [federal] court[]." Argentine Republic v. Amerada Hess

Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L. Ed. 2d 818 (1989). Under the

FSIA, foreign states enjoy immunity from suit in U.S. courts unless Congress waives immunity

under an enumerated exception. 28 U.S.C. § 1604; see id. §§ 1605-1607. The exception at issue

in this case is § 1605(a)(7), also known as the "terrorism exception," which was enacted in 1996

as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). See Pub. L. No. 104-

132, § 221, 110 Stat. 1214 (1996) (codified at 28 U.S.C. § 1605(a)(7)). Section 1605(a)(7)

waives immunity of a foreign state in any case

> in which money damages are sought against a foreign state for personal injury
> or death that was caused by an act of torture, extrajudicial killing, aircraft
> sabotage, hostage taking, or the provision of material support or resources (as
> defined in section 2339A of title 18) for such an act if such act or provision is
> engaged in by an official, employee, or agent of such foreign state while acting
> within the scope of his or her office, employment, or agency . . . .

§ 1605(a)(7). The terrorism exception has the following jurisdictional requirements: "(1) the

provision of material support by a state sponsor of terrorism; (2) the provision of such support by

an official of the state 'while acting within the scope of his or her office, employment, or

agency'; and (3) a causal link between the material support and damage resulting from an act of

terrorism." Rux, 461 F.3d at 467 (citing § 1605(a)(7)). The exception applies only if the foreign

state against whom the suit is brought was designated as a state sponsor of terrorism by the U.S.

Department of State at the time the act occurred or as a result of the act, the foreign state was

afforded a reasonable opportunity to arbitrate the claim if the alleged act occurred in the foreign

state against which the claim has been brought, and either the claimant or the victim was a

national of the United States at the time of the alleged act. 28 U.S.C. § 1605(a)(7)(A) & (B)(i)-

(ii).

The Court reaffirms its finding, which was affirmed by the Court of Appeals prior to submission of the evidence, that it has jurisdiction over the subject matter of this action. Rux, 461 F.3d at 467-75. Sudanese Government officials, employees, or agents acting within the scope of their office provided various forms of "material support" as defined in 18 U.S.C. § 2339A(b), including lodging, safehouses, financial services, false documentation, and transportation, to Al-Qaeda, whose operatives planned and carried out the Cole bombing. See 18 U.S.C. § 2339A(b)(1) (defining "material support or resources").[10] The deliberate murder of the seventeen American sailors qualifies as an "extrajudicial killing."[11] Jurisdictional causation under 28 U.S.C. § 1605(a)(7) is satisfied, as the evidence establishes a "reasonable connection between [Sudan's] provision of material support to [Al Qaeda] and the damage arising out of [the] terrorist attack" against the Cole. Rux, 461 F.3d at 473. Since 1993, the U.S. Department of State has designated Sudan as a state sponsor of terrorism in accordance with § 6(j) of the Export Administration Act, 50 U.S.C. § 2405(j). 58 Fed. Reg. 52523-01 (Oct. 8, 1993). The alleged acts occurred in a foreign state or states, so there is no arbitration requirement and, in any

---

[10]"Material support or resources" is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials[.]" 18 U.S.C. § 2339A(b)(1); see § 1605(a)(7) (incorporating the definition of "material support or resources" from 18 U.S.C. § 2339A(b)(1)).

[11]An "extrajudicial killing" for purposes of § 1605(a)(7) is defined in § 1605(e)(1) as having the same meaning given to that term in section 3 of the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note, i.e., "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include such killing that, under international law, is lawfully carried out under the authority of a foreign nation." 28 U.S.C. § 1605(a)(1); id. § 1350 note.

23

event, Plaintiffs made an offer to arbitrate on July 16, 2004 [Doc. No. 3]. Finally, the victims

and claimants were nationals of the United States at the time of the alleged acts.

Personal jurisdiction over a non-immune sovereign exists so long as service of process

has been made under § 1608 of the FSIA. 28 U.S.C. § 1330(b); see also Blais v. Islamic

Republic of Iran, 459 F. Supp. 2d 40, 53-54 (D.D.C. 2006). As this Court previously concluded,

Sudan waived personal jurisdiction, and service on Sudan was made in accordance with due

process. See Order of Aug. 26, 2005 at 29-43 [Doc. No. 47]. The Court reaffirms its findings

that it has *in personam* jurisdiction over Sudan and that venue is proper.

**B.      Liability**

While the FSIA vests jurisdiction in federal courts to hear cases against foreign states, it

does not afford plaintiffs with a substantive cause of action. Thus, once a court determines that

subject matter jurisdiction exists, it must determine what, if any, causes of action the plaintiff

may bring against the defendant, and whether the foreign state is liable on any of those claims.

See Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1133-36 (D.C. Cir.

2004); Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1033 (D.C. Cir. 2004);

Dammerell v. Islamic Republic of Iran, No. 01-2224, 2005 WL 756090 at *5 (D.D.C. Mar. 29,

2005) (Bates, J.).

The question of which law provides Plaintiffs with a cause of action presents issues of

first impression because the Cole attack occurred in a foreign state's territorial waters, possibly

bringing the matter within the scope of U.S. admiralty laws. Plaintiffs contend that liability

should be governed by the common law of intentional infliction of emotional distress ("IIED")

of the state of Virginia, which is the state of residence of at least one of the victims killed aboard